HARRIET BONSON *et al.*, Appellants, v. GEORGE W. JONES, Appellee.

1. **Title to Real Estate:** RESERVATION OF MINING RIGHT IN DEED: CONSTRUCTION. The claimants to certain real estate, while the title thereto was still in the government, transferred all their interest therein to an adverse claimant, reserving to themselves, however, the privilege of mining and drifting any crevice or range, struck by them on their own ground, through the land conveyed, and reserving, further, the privilege of sinking shafts on the latter by paying to said grantee one sixth of all the mineral discovered or raised as rent on the conveyed premises. Subsequently said grantee acquired title to said premises from the government, and by successive conveyances, made subject to the rights of the above grantors, they became the property of the plaintiff's devisor. The defendant claims to have acquired said mining right by purchase from said grantors, or those claiming under them, and had mined on said premises almost continuously for about thirty years when this action was commenced to quiet the title thereto in the plaintiffs. Before his death the plaintiff's devisor paid the defendant for ore mined on said lands. *Held,* that the reservation in said original deed was not that of a mere life estate, which terminated with the death of the grantors in said deed, nor a personal privilege or license only, which could not be assigned, but gave the grantors and their grantees a continuing right to mine through said premises, limited only by the extent of the range that should be discovered.

2. ———: ———: ———: BUILDINGS ERECTED ON LANDS OF ANOTHER. No right being reserved in said original deed to erect buildings on the conveyed premises for use in connection with the mining thereof, *held,* that the burden was upon the defendant to show that the privilege to erect houses on said lands was necessary to the right to work the mine, and that, in the absence of such evidence, the title to a permanent dwelling on said premises, voluntarily erected by the defendant, should be quieted in the plaintiff.

*Appeal from Dubuque District Court.*—HON. D. J. LEN-EHAN, Judge.

MONDAY, OCTOBER 16, 1893.

ACTION in equity to quiet in the plaintiffs the title to certain real estate. There was a hearing on the mer-

its, and a decree in favor of the defendant. The plaintiffs appeal.—*Modified and Affirmed.*

*Robt. Bonson* and *R. W. Stewart*, for appellants.

*William Graham* and *John Deery*, for appellee.

ROBINSON, C. J.—The plaintiffs claim to be the absolute and unqualified owners of mineral lots numbered 264 and ·265 and of lot numbered 1, of Union place, a subdivision of mineral lot numbered 268, all in Dubuque county, including all mineral rights thereto appertaining, and that such ownership was acquired by them as devisees of Richard Bonson, deceased. The lots are traversed from east to west by a vein of lead ore known as the "Karrick Range." The defendant concedes that the plaintiffs are the owners of the lots, subject to his rights therein, which are claimed to be as follows: *First*, the title in fee to Karrick range in lot 1, subject to the obligation to pay to the plaintiffs as rent one sixth of the mineral taken therefrom; *second*, the title in fee to the Karrick range in lots 264 and 265 subject to the obligation to pay a reasonable mineral rent for lot 265; *third*, the right to occupy a portion of the surface of the lots for the dwellings of workmen. The defendant asks that his interest in the Karrick range be established as against the plaintiffs. The plaintiffs, by way of reply, claim that whatever right the defendant may have had in the property has been forfeited. The district court decreed that the plaintiffs' bill be dismissed, and that "the defendant's mineral and mining interest in lot 264 and mining right in lot 265 and lot 1, Union place, is hereby established, subject to the payment to the plaintiffs of one sixth rent in said lot 1, and a reasonable rent in lot 265."

I. On the twenty-seventh day of February, 1847, William Carter entered into an agreement in writing

with George W. Starr and John T. Cook, which was duly acknowledged and recorded, a copy of which is as follows:

"Memorandum of agreement made and entered into this twenty-seventh day of February, 1847, between Wm. Carter, of Dubuque county, Iowa, of the one part, and Geo. W. Starr and John T. Cook of the other part, as follows, to wit: The said Wm. Carter, for and in consideration of certain transfers, relinquishments and stipulations hereinafter mentioned, made by said Starr and Cook, party of the second part, to him, the said Carter, party of the first part, doth hereby relinquish, release and transfer to the said Starr and Cook all his right, title and interest to all the ground or mineral lots heretofore claimed by him, and contested by the said Starr and Cook, and also to a strip or piece of land being on the north side of said ground in contest between the said parties, and between the northern boundary of said ground and a line run or surveyed by Mr. Calhoun during the past year, and also a strip or piece of land lying on the south side of said ground in contest, and between the northern ·boundary of the same and the middle of the main public road, the three pieces or parcels of land making one tract, which is to extend west towards the said Carter's inclosed farm, to within fifteen feet of the fence now inclosing said Carter's farm on the east side. And the said Starr and Cook do hereby release, relinquish and transfer to the said Carter all their right, title and interest and claim to all the ground now claimed by said Carter, and on which they, the said Starr and Cook, heretofore claimed a mining right, lying west of said line fifteen feet east of the fence now inclosing said Carter's farm, reserving or still holding and enjoying the privilege of mining and drifting any crevice or range struck by them on their own ground through

1. TITLE to real estate: reservation of mining right in deed: construction.

said Carter's ground, with the privilege of sinking
shafts on said Carter's ground by paying to said Carter
one equal sixth portion of all mineral discovered or
raised, as rent on said Carter's ground, lying west of
the line, fifteen feet east of the fence.  And it is fur-
thermore agreed upon, by and between the said parties,
that a road thirty feet wide, extending fifteen feet
either side from the division line, now fifteen feet east
of said Carter's fence, shall be kept open and unin-
closed for the purpose of a road.  In witness whereof
the said parties have hereunto set their hands and
seals, the day and year first and above written.

> "WILLIAM CARTER,
> "GEO. W. STARR,
> "JOHN T. COOK.

"In presence of:   W. Lewis, Thomas H. Benton, Jr."

The appellee, to support his claim to lot 1, Union
place, relies especially upon the reservation made
by Starr and Cook, in words as follows:   "Reserving
or still holding and enjoying the privilege of run-
ning and drifting any crevice or range struck by
them on their own ground through said Carter's
ground, with the privilege of sinking shafts on said
Carter's ground by paying to said Carter one equal
sixth portion of all mineral discovered or raised, as
rent on said Carter's ground."   On the thirteenth day
of March, 1847, Carter became the owner in fee of lot
268, also known as "Carter's Field," by purchase from
the United States.   In the year 1856 the lot was sub-
divided, and lot 1 of Union place was made one of the
subdivisions.  In October of that year, Carter conveyed
to C. H. Booth lot 1, by a warranty deed, subject to
an incumbrance, described as "a certain agreement
entered into between myself and Geo. W. Starr and
John T. Cook on the twenty-seventh day of Feb-
ruary, 1847, and recorded," etc.  In June, 1877, Booth
conveyed the lot to Richard Bonson by a warranty deed,

subject to an incumbrance, described the same as in the deed to Booth.

Lot 264, sometimes called the "Starr Lot," east of and adjoining lot 1, was purchased of the United States by George L. Nightingale and William Carter, and by them conveyed to Starr on the twenty-fifth day of March, 1847. Lot 265, otherwise known as the "Levi Lot," east of and adjoining lot 264, was purchased of the United States by Nightingale on the twelfth day of March, 1847, and in March, 1848, it was conveyed to A. Levi. In May, 1848, Starr, Levi and one John Noel entered into an agreement, of which the following is a copy:

"Articles of agreement made and entered into by and between George Starr and John Noel and Alexander Levi, all of the city and county of Dubuque, state of Iowa, witnesseth, that the said Starr, Noel and Levi covenant and agree with each other to dig and mine in partnership the following land and mineral ground, lying and being situated in the county of Dubuque, and known as the 'Levi Lot,' or mineral lot 265, also the 'Starr Lot,' or 264, lying immediately west and adjoining the Levi lot, and, finally, so much of the ground through William Carter's field as was granted by the said Carter to the said Starr for mining purposes, which grant was made by an instrument of writing between the said Carter and Starr, bearing date the twenty-seventh day of February, 1847. And the said Starr, Noel, and Levi are to do an equal portion of the work, and pay an equal portion of all expenses necessary to carry on the mining on any of the land above described, and to share equally, after paying the ground rent, all the mineral which may be discovered by or through them on the land aforesaid; the rents to be paid are as follows: On the Levi lot one fourth, on the Starr lot one fourth, and on the Carter field one sixth, of all the mineral raised or taken out of the

respective lots, and the rents aforesaid shall be paid over and delivered up to the respective owners of the same, each owner to have all the rents arising from his own lot. It is further agreed by the parties that this instrument of writing shall be irrevocable so long as there remains a prospect of making mineral discoveries, or the mineral is worked out, or the mineral in sight. In witness whereof the aforesaid have hereunto set their hands and seals, this thirty-first day of May, 1848.

"GEORGE W. STARR.

"JOHN NOEL.

"ALEX. LEVI.

"Executed in presence of L. Nadean."

In some manner not fully disclosed by the record, George W. Samuels acquired an interest in the mining right in controversy, which has been transferred to the defendant. George W. Karrick at one time had an interest in the same right, but through conveyances, which need not be described, the defendant acquired his interest, and also that of Starr, Levi, and Noel, in the same right. Whether Cook ever made a formal transfer of the rights he acquired under the Carter agreement does not appear. The plaintiffs do not claim to have acquired it, unless by operation of law on the death of Cook. The defendant testifies that about the year 1855 the right in controversy was owned by Samuels, Karrick, Starr, and Levi; that at different times he purchased their interests, and about the year 1860 became the sole owner of the right. The case of *Levi v. Karrick*, 13 Iowa, 345, grew out of transactions involving the use of the right before he claims to have become its sole owner.

The appellants contend that the title to the property claimed by the defendant was vested in the general government when the Carter agreement was made, in February, 1847; that the agreement merely transferred certain alleged rights without words of warranty, and

that it was not effectual to transfer any interest; that the description of the property conveyed was so indefinite that no surveyor could locate the property; and that the agreement was without effect as a conveyance for that reason. The appellants further claim that the agreement transferred to Starr and Cook at most, only a life estate, which has been terminated by their death; that the interest transferred was only a license, personal in its nature, which was revoked by assignment, if not terminated by the death of the licensees; that the interest of the defendant, if anything, was that of a tenant, which has been terminated by a denial of the title of his landlord.

It must be admitted that there are defects in the paper title of the defendant, but it is clear he has been in possession of the right in question, by himself and tenants, under a claim of ownership adverse to all others, for about thirty years. The Carter agreement, which is the foundation of his title, was evidently made in settlement of conflicting claims to mineral lands which the parties to it had been making. The description of the property conveyed, although somewhat indefinite in terms, seems to have been sufficiently full and specific for all practical purposes, when applied to the property to which it referred. There is no suggestion that any difficulty has been met in ascertaining that property. On the contrary, possession of the Karrick range was held when the agreement was made, or was taken soon after that time by parties through whom the defendant claims, and has been held continuously since.

The agreement reserved to Cook and Starr, not a mere life estate, but the right to work through the ground yielded to Carter any crevice or range struck by them on their own ground, and the Karrick range was so struck. The privilege or right thus reserved was limited only by the extent of the range which

should be discovered. This is shown in part by the construction placed upon the agreement by the parties to it and their immediate successors in interest. The defendant has caused the range to be worked almost continuously since he purchased it. His share of the mineral raised was delivered to Richard Bonson, the devisor of the plaintiffs, a smelter, who recognized the right of the defendant to the range, and paid him for the mineral. As against the defendant the plaintiffs acquired no rights by the will of Richard Bonson which he could not have asserted, and he purchased the land with knowledge of the rights of the defendant. His title to it, subject to the claims now made by the defendant, has not been denied by the latter, and his rights have not been terminated by the death of the parties to the Carter agreement, nor by any act on his part. He has been in quiet and peaceable possession of the range, under a claim of right, too long to be disturbed now.

II. The petition alleges that the defendant erected a frame house on lots 264 and 265, less than two years before this action was commenced, without authority from the plaintiffs, and that he is now in possession of it, and has tenants living therein. The defendant, in his answer, admits that these allegations are true, and avers that he erected the house by virtue of his ownership of an interest in the lots. The pleadings justify the presumption that the house is a permanent structure, which must be regarded as a part of the lots upon which it stands. The defendant states as a witness that he claims the right to erect shanties on the surface of the lot for his men to live in, but no evidence was offered to show the character of the house, nor the purpose for which it was built, nor that it is used in connection with the working of the range. The Carter agreement does not in terms reserve the right to erect

2. ——: ——: ——: buildings erected on lands of another.

buildings upon the surface of the land, and, if there was such a reservation, it was implied as appurtenant to the right which was expressly reserved. Nothing in the evidence submitted shows that the privilege of erecting houses was necessary to the right to work the mine, nor that such privilege was ever claimed by the defendant until recently. From what source he claims the privilege does not appear. The burden was on him to show that he had a right to erect and maintain a house, and that he has failed to do. The house was erected by him voluntarily, with knowledge of his legal rights, and must be regarded as a part of the realty owned by the plaintiffs. Therefore the district court erred in not adjudging the title to the house to be in the plaintiffs, and in failing to quiet the title thereto in them.

The appellants complain that the decree was not sufficiently specific in defining the rights of the defendant in the Karrick range. That objection should have been made in the district court; and, as it was not, will not be further considered by us.

The decree of the district court is MODIFIED AND AFFIRMED.